IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DERRICO AUBREY,

    Petitioner,                    No. 2:12-CV-0108 MCE DAD

    vs.

MICHAEL MARTEL,

    Respondent.               FINDINGS & RECOMMENDATIONS

_____/

        Petitioner, a state prisoner, proceeds pro se with a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner challenges a 2008 judgment of conviction entered against him in the San Joaquin County Superior Court on one count of second degree murder and one count of torture. Petitioner seeks federal habeas relief on the ground that the trial court deprived him of his due process right to present a defense. After careful consideration of the record and applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

## FACTUAL BACKGROUND

        The California Court of Appeal for the Third Appellate District summarized the facts underlying the offenses of conviction in an unpublished memorandum and opinion on direct appeal, as follows:

1

Defendant and Carla Alexander had been involved in a long-term relationship; their daughter was born in 2000, shortly before they moved to Stockton. Alexander also had four teenagers from a previous relationship. Alexander had been a user of heroin for a number of years. Defendant was also a self-admitted user of heroin who testified that he had overcome an addiction but was still using at the time of Alexander's death. Alexander and defendant had moved into a home down the street from defendant's uncle, William Bennett, whose wife, Sabrina Banks, had three children from her previous relationship living with them.

Defendant admitted having a tempestuous relationship with Alexander. They argued all the time; they would slap, push, and shove each other, but he would hit her only as a response to her hitting him. Several witnesses testified about direct and circumstantial evidence that defendant had physically abused Alexander on various occasions. Bennett and Banks testified that Alexander frequently stayed at their house after an argument with defendant, sometimes looking the worse for wear. It was her safe house. They even took Alexander to a home in Oakland around Christmas 2005 after a fight to get her away from the environment with defendant, but she returned after a few days.

In the final week of January 2006, defendant's mother, Dorothy Wade, had dinner with Alexander (in defendant's absence) on Thursday night. Wade was a registered nurse. In the course of her profession, she had become familiar with the signs of someone being under the influence of heroin or withdrawing from heroin, and had seen Alexander suffering withdrawal symptoms before. Alexander, however, did not appear to be ill or have anything else wrong with her that evening other than a runny nose (which was among the signs of heroin withdrawal) and a headache (which was a chronic problem). Her appetite was healthy. They discussed Alexander's heroin use; Alexander expressing the desire to conquer her addiction.

One of Alexander's daughters, M.G., had been sick at home from school all week, and testified that Alexander had appeared to be sick as well. Early Friday morning on January 27, M.G. awoke hearing defendant yelling and her mother telling him to stop. Eventually, the arguing and loud noises stopped; defendant came into the bedroom M.G. shared with the youngest child and told them to get dressed because he was taking them to his grandmother's house. Alexander then came into the bedroom, bent over, and was holding her stomach as if she were ill. She slowly moved toward M.G.'s bed and lay down. M.G. did not notice any visible injuries. As Alexander lay there, she spoke with defendant's great-aunt, Anita Clay, on her cell phone. Defendant came into the room and carried Alexander back into their bedroom. As defendant drove the children to Clay's house, he told them not to say anything about him hitting their mother.

2

Wade had called Alexander about 6:30 a.m. that Friday to remind Alexander that she was going to give Alexander a ride to the hospital at which Wade worked to apply for a housekeeping position. Alexander had not sounded as if she was in pain or was having any difficulty breathing. However, when Wade stopped by the residence between 8:30-8:45 a.m., no one answered the door. She was there about 10-15 minutes. A group of young men standing across the street told Wade that they had seen Alexander go down the street.

The Bennett's oldest stepson, Demarcus Banks,[FN1] was down the block from their home when he thought he saw someone near their driveway. It was late morning or early afternoon. After calling his mother at work to determine whether anyone was expected to be there (Bennett and his sister, Larnett Frazier, having gone to the Bay Area to see Bennett's doctor), Demarcus went back to the home and found that the previously unlocked front door was now locked. He jumped the fence and entered through the back door, finding Alexander lying on the sofa. When Demarcus started to leave through the front door, Alexander asked him to keep the door locked. Demarcus ran into defendant in front of the latter's home. Defendant asked Demarcus if he had seen Alexander; Demarcus said he had not. In response, defendant told him that Alexander "ran way, she left the house, and that she don't have anywhere to stay."

> FN1. We refer to Demarcus by his first name to distinguish him from his mother, Sabrina Banks.

When Banks returned home, Alexander said that she was okay and just needed to lie down. Alexander moved to a bed in one of the children's rooms. By early Friday evening, Bennett had returned home and Alexander's children had joined her at Bennett's house. Alexander told Banks earlier that day that "she didn't feel good" and asked one of her children for a beverage, appearing to have difficulty sitting up when one of her daughters brought it to her. Bennett and Banks suggested that they take Alexander to the doctor, but she demurred. Banks later told police that Alexander was having difficulty breathing, and complained of pain whenever she moved. This was the worst condition in which Banks had ever seen Alexander.

On Saturday morning when Banks returned home from work early, Alexander was in the kitchen getting some water. Suddenly Alexander fell to the floor, saying she felt weak. Once again, she rejected the suggestion that she see a doctor, and said she simply needed to lie down. As they helped her back to the bedroom, Alexander vomited "brown looking stuff."

That Saturday evening, Bennett needed to take his wife to the emergency room for treatment for her Bell's palsy. Alexander

3

refused to go with them.  They were gone for a couple of hours. When they returned, Bennett found Alexander seated on the toilet in the master bedroom with her pants down, her mouth and eyes wide open and her arms down at her sides.  (She had never previously been in the bedroom or that bathroom.)  Bennett called to his wife, who came in and could not feel a pulse.  The wife called both 911 and Wade, who lived nearby.  Wade arrived first and began performing CPR until the paramedics got there; they were unsuccessful in reviving Alexander.  Defendant arrived during their efforts, weeping and shouting upon learning that Alexander was dead.  Wade took him away.

The autopsy took place on Sunday morning.  Alexander's body had multiple minor blunt force injuries, with over 45 bruises, a couple of abrasions, and a cauliflower ear.  The bruises were one to two days old, except for a major bruise in the breastbone area that was somewhat older.  X-rays revealed 15 broken ribs, two of which were gaping fractures.  Some of these were recent, and had hemorrhaged into her body cavities.  A blunt force had lacerated her liver as well, with blood accumulating in its capsule and leaking into her body cavity.  There was also blood in the heart sac. Overall, there was close to one and a half quarts of blood in the body cavities.  The pathologist believed that the cause of death was shock and hemorrhaging from multiple fractured ribs and a lacerated liver.  While CPR can fracture ribs, the fracture would be in a different location than Alexander's injuries, which also had older-looking hemorrhaging and swelling.  CPR could account for the blood in the heart sac.  Alexander had severe emphysema, which may have shortened her life by several hours.  A toxicologist found various over-the-counter pain medications in Alexander's system, as well as codeine and morphine.  The morphine could be a product either of the codeine or heroin (the latter of which will clear from the bloodstream after 12 hours.)

Defendant testified.  In the week before her death, Alexander had the flu and was experiencing heroin withdrawal (which included symptoms of stomach cramps, pain, and a lack of appetite).  After his mother called Alexander that Friday morning about the housekeeping job, defendant had an argument with Alexander about her desire to get some heroin before meeting with his mother.  Defendant reminded her that a dealer had confronted him about her outstanding debt.  He asserted that the argument was strictly verbal, not physical.  When he drove the children to his grandmother's house, he told them not to tell anyone about the argument, but did not threaten the girls in any way.  He returned to his home about noon.  He was not concerned when he did not see Alexander there, and left.  When he came back later, he encountered Demarcus outside, who said he had not seen Alexander.  Defendant called a couple of people to see if he could find out where she was.  However, he knew from past experience that sometimes Alexander would go away for a couple of days.  When he saw his mother going to Bennett's house the next night, followed by ambulance lights, he ran there.  Initially, he thought

4

Alexander had overdosed on something.  When he discovered that she was dead, he went into shock and his mother took him away.  He spent a couple of days with friends until his arrest.  Defendant also disputed some of the circumstances of some of the other incidents in which witnesses had claimed he was abusing Alexander.

People v. Aubrey, No. C060132, 2010 WL 4851371 at 1-4 (Cal. App. 3 Dist., Nov. 30, 2010). See also Notice of Lodging Documents on April 30, 2012 (Doc. No. 13), Resp't's Lod. Doc. 4 (hereinafter Opinion).

## PROCEDURAL BACKGROUND

Petitioner was charged by Information on June 2, 2006 with special circumstance murder by torture (count one) and torture with personal infliction of great bodily injury involving a domestic partner (count two).  (Clerk's Transcript on Appeal, Volume 2 (hereinafter 2CT) at 331-33).  It was further alleged for sentence enhancement purposes that he had suffered a prior serious felony conviction.  (2CT at 333.)  On April 15, 2008, petitioner's first jury trial in the San Joaquin County Superior Court commenced.  (2CT at 427.)

On May 23, 2008, the jury returned its verdict finding petitioner not guilty of special circumstance murder as charged in count 1.  (2CT at 494.)  The jury was unable to reach a verdict on any lesser included charges as to count 1 or the torture charge set forth in count 2, and the court declared a mistrial as to those charges.  (Id.; Augmented Reporter's Transcript (hereinafter ART) at 173-74.)

Jury selection in connection with petitioner's retrial commenced on August 5, 2008.  (3RT at 654.)  On August 12, 2008, the jury was impaneled.  (Id. at 683.)  Opening statements by both counsel were made and the prosecution began presenting its case in chief on August 15, 2008.  (Id. at 687-88.)  On August 18, 2008, the prosecution filed a First Amended Information charging petitioner with torture in violation of California Penal Code § 206 with infliction of great bodily injury as defined in Penal Code § 12022.7 (count two) and murder with of no specified degree in violation of Penal Code § 187 along with sentencing enhancement allegations related to prior convictions (count three).  (3CT at 690-94.)  On August 19, 2008,

5

petitioner was arraigned on the First Amended Information. (Id. at 695.)[1] The presentation of evidence concluded on August 26, 2008 and thereafter the jury heard the closing arguments of counsel. (Id. at 707-10.)

On August 27, 2008 the jury retired to deliberate and subsequently returned its verdict finding petitioner guilty as charged in counts 2 and 3 of the First Amended Information and finding true the great bodily injury enhancement allegation with respect to count 2. (Id. at 710.) On September 29, 2008, the trial court found the enhancement allegation that petitioner had suffered a prior serious felony conviction to be true. (Id. at 863.) Pursuant to those guilty verdicts and findings the court sentenced petitioner to a term of fifteen years to life in state prison for the murder charged in count 3, doubled to thirty years to life in state prison based on the prior conviction, and stayed sentencing on the torture count charged in count 2. (Id. at 863-65.)

Petitioner appealed from the judgment of conviction to the California Court of Appeal for the Third Appellate District. (Resp't's Lod. Doc. 1). On November 30, 2010, the state appellate court affirmed the judgment. (Opinion at 5.) On February 16, 2011, the California Supreme Court denied a petition for review filed on petitioner's behalf. (Resp't's Lod. Doc. 6.)

/////
/////
/////

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

---

[1] At the time of petitioner's August 19, 2008 arraignment, the trial court clarified that due to a computer error, the First Amended Information also erroneously still reflected a count one, alleging special circumstance murder by torture, even though the jury in petitioner's first trial had found him not guilty of first degree murder thereby prohibiting his retrial on that charge. (Reporter's Transcript. (RT at 154-56.) As noted by the trial court, count three was added in the First Amended Information reflecting the fact that the jury at the first trial had been unable to reach a verdict on second degree murder or any lesser included charge. (Id.)

6

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme

Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because
/////
of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1   The court looks to the last reasoned state court decision as the basis for the state
2   court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.
3   2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning
4   from a previous state court decision, this court may consider both decisions to ascertain the
5   reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en
6   banc). "When a federal claim has been presented to a state court and the state court has denied
7   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence
8   of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at
9   784-85. This presumption may be overcome by a showing "there is reason to think some other
10  explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker,
11  501 U.S. 797, 803 (1991)). Where the state court reaches a decision on the merits but provides
12  no reasoning to support its conclusion, a federal habeas court independently reviews the record to
13  determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860;
14  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is
15  not de novo review of the constitutional issue, but rather, the only method by which we can
16  determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at
17  853. Where no reasoned decision is available, the habeas petitioner still has the burden of
18  "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct.
19  at 784.

20  When it is clear, however, that a state court has not reached the merits of a
21  petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a
22  federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v.
23  /////
24  /////
25  Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.
26

2003).³

II. Petitioner's Claim

      Petitioner claims that the trial court deprived him of due process and his right to present a defense in violation of the Sixth and Fourteenth Amendments to the United States Constitution when during his retrial the court ruled that the potentially exculpatory testimony of witness Larnett Frazier, that a drug dealer had beaten up Alexander, was inadmissible.⁴ (Doc. No. 1 at 8, 10.⁵)

      The state appellate court summarized the background facts relevant to this claim as follows:

> At defendant's first trial, Frazier (with whom Alexander had a close relationship that included "getting high" together, according to defendant) testified as a witness for the prosecution. In the course of what charitably may be described as vague responses to the prosecutor's questioning (admitting that her memory of the period was not good because she "was in [her] addiction while all of this was going on"), Frazier noted that Alexander "owed some dope people," which was a problem. Frazier expanded on this on cross-examination, noting that she had warned Alexander against getting heroin on credit, because "if you don't pay them, they do things to you." When the prosecutor pursued this, Frazier declined to say whether Alexander had ever told her about a drug dealer

---

³ The United States Supreme Court has recently granted certiorari in a case apparently to consider this issue. See Williams v. Cavazos, 646 F.3d 626, 639-41 (9th Cir. 2011), cert. granted in part, 132 S. Ct. 1088 (2012).

⁴ Petitioner asserts that Frazier was allowed to provide this exculpatory testimony "without question" at his first trial (Doc. No. 1 at 8), however the record does not support this assertion. Petitioner cites to pages 425-36 of the Reporter's Transcript in support of this claim. However, those pages of the transcript reflect a hearing held pursuant to California Evidence Code § 402 during petitioner's second trial, not trial testimony given at his first trial. At petitioner's first trial, as discussed by the state appellate court, when asked by the prosecutor on re-direct examination: "So, she never told you that she had ever been beat up dy a dope dealer did she?", Frazier refused to answer the question and was not pressed to do so. (ART at 42.) On re-cross examination, Frazier testified "once [Alexander] said [a drug dealer] slapped her." (ART at 48.) Asked whether she had ever told investigators that Alexander said she had recently been "F'ed up by a drug supplier," Frazier stated "I don't remember. I might have did." (ART at 48-49.)

⁵ The page numbers referenced are those assigned by the court's CM/ECF system, where applicable.

10

beating Alexander up. When defense counsel asked why, Frazier said that it had been told to her in confidence and "[t]hey got paid, so it didn't matter." Defense counsel pressed the point, and Frazier admitted that Alexander had mentioned being slapped by a drug dealer a week before her death. Frazier did not remember telling a defense investigator that Alexander had been "F'd up by someone she owed money for drugs."

Before the second trial, defense counsel moved in limine to admit Alexander's hearsay statement to Frazier (made about a week before her death) that a drug dealer had just beaten her up about 15 minutes earlier. Counsel argued this was a spontaneous utterance within the meaning of Evidence Code section 1240. He included the report of his investigator, who had interviewed Frazier between the two trials and obtained this statement (noting that she seemed "less affected" by her methadone treatment than in previous interviews).

On the fourth day of trial, the court held a foundational hearing on the motion out of the presence of the jury. Frazier testified. She affirmed that Alexander had told her about being beat up by a drug dealer, and that Alexander had asked for money to pay the debt. This was about three or four days before her death, and she was in a great deal of pain. Alexander was at Bennett's house when she told Frazier about it. Frazier could not remember if Alexander had told her exactly when the beating had taken place, but it "hadn't been too long" before. Frazier had seen Alexander earlier that day, and she had not at that time complained about a beating (although Alexander was in pain at that earlier time as well). When the court expressed confusion over whether Frazier was talking about a conversation at Bennett's house on the day that Alexander died, Frazier asserted that it had been at some point before that.

In ruling the court first noted that "To be charitable, [Frazier] has no recollection of what really happened. She is so confused and addled . . . [S]he really doesn't have a very good memory, and any memory for what happened, and so . . . I'm going to make a finding [t]hat whatever she says . . . I don't think it has any trustworthiness at all . . ." Piecing together Frazier's testimony as best it could, the court then found that Alexander had been out of Frazier's presence for a substantial period of time between her initial complaint of pain and her attribution of her injuries to an attack by a drug dealer, which presented more than enough time for Alexander to reflect on what she wanted to say about her injuries (and there was abundant testimony indicating that Alexander had a practice of refusing to report defendant for injuring her). It thus excluded this evidence.

(Opinion at 3-4.)

/////

11

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a defense and to present relevant evidence in their own defense." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). A state evidentiary rule excluding evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." United States v. Scheffer, 523 U.S. 303, 308 (1998). See also Holmes, 547 U.S. at 324 (finding unconstitutional a state law rule of evidence preventing the defendant from introducing proof of third-party guilt if the prosecution had introduced forensic evidence that, if believed, strongly supported a guilty verdict) (internal citations omitted); Crane, 476 U.S. at 689-91) (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"). The Supreme Court has found a violation of the right to present a complete defense in cases where a state evidentiary rule, on its face, "significantly undermined fundamental elements of the defendant's defense," but did little or nothing to promote a legitimate state interest. Scheffer, 523 U.S. at 315. See also Holmes, 547 U.S. at 324-26.

The right to present relevant evidence is, however, subject to reasonable restrictions. Scheffer, 523 U.S. at 308; Taylor v. Illinois, 484 U.S. 400, 410 (1988) (holding that an accused does not have an "unfettered right" to present any evidence he or she wishes); Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009); Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir. 2003). In general, evidence may be excluded without violating due process if "its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547 U.S. at 326. See also Crane, 476 U.S. at 689-90 ("[T]he Constitution leaves to the judges . . . 'wide latitude' to exclude evidence that is
/////
'repetitive . . . only marginally relevant' or poses an undue risk of 'harassment, prejudice, or

confusion of the issues.'") (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986)).

Here, the state appellate court upheld the trial court's exclusion of the evidence at issue, reasoning as follows:

> As is customary in reviewing evidentiary rulings, we determine whether the trial court acted rationally in deciding whether the facts before it came within the hearsay exception for spontaneous utterances, i.e., whether this was an informed exercise of its discretion. (<u>People v. Poggi</u> (1988) 45 Cal.3d 306, 318-19, 246 Cal. Rptr. 886, 753 P.2d 1082 (<u>Poggi</u>).) It is essential to the foundation of trustworthiness for this hearsay exception that the facts show a state of nervous excitement on the part of the declarant that is sufficient to abate the declarant's reflective powers. (<u>Ibid.</u>)
>
> Defendant first dismisses the court's finding on Frazier's utter lack of credibility. He contends this is not a relevant criterion in ruling on whether a statement was a spontaneous utterance because it is not expressly included among the elements in Evidence Code section 1240. However, the competence of a witness to establish the foundational facts is part of a trial court's general duty to determine whether a proponent has carried the burden of proof on the issue. (Evid. Code, § 405, subd. (a).) Nevertheless, even if we assume that defendant adequately established the foundational facts through Frazier's testimony, he still does not prevail.
>
> Defendant cites the facts in a number of other cases where a statement came within the hearsay exception. However, we must review the court's ruling in light of the specific facts in the record before us, and therefore it is generally unproductive to compare the circumstances of different cases on a question of fact such as this. [Citations omitted.] <u>Poggi</u> also suggests that in this particular context, a trial court's exercise of its discretion on the issue is all but absolute. (<u>Poggi</u>, <u>supra</u>, 45 Cal.3d at p. 319, 246 Cal. Rptr. 886, 753 P.2d 1082.) We thus do not find it necessary or helpful to discuss these other cases.
>
> Defendant, addressing the facts in the present record, claims that Alexander had been continuously in severe pain from the time of the beating, and therefore her reflective abilities were in abeyance the entire time. This is simply defendant's interpretation of the facts, which is not the sole way in which to read them. Frazier never described Alexander as being in the throes of overpowering pain. At the time of Alexander's fatal beating, she was capable of making her escape from the home she shared with defendant and concealing herself at Bennett's home, and was foresighted enough to ask Demarcus to keep the front door locked. She was capable of communicating with the members of Bennett's household and resisting suggestions that she see a doctor (in keeping with her

13

        habit of refusing to report incidents of domestic violence).[FN2] These are hardly the actions of a declarant unable to exercise reflective abilities as the result of her fatal injuries.[FN3]  As a result, defendant fails to show that the trial court abused its broad discretion in ruling on the issue.

        FN2.  Contrary to defendant's claim, attributing this motive to Alexander was not overstepping the court's function. The court could determine from the other evidence at trial that Alexander's injuries were not in fact overcoming her reflective abilities, because this story was consistent with her past practice of deflecting blame from defendant.

        FN3.  If Frazier was purporting to give an account of the aftermath of some other beating in the week before Alexander's death, this seems unlikely given the testimony of defendant's mother that Alexander was in good condition on Thursday night.  As the trial court found, while Frazier may have had a conversation with Alexander about a beating from a drug dealer, Frazier was otherwise utterly unable to provide a context for it.  Defendant himself argues that Frazier was recollecting a conversation she had with Alexander after the fatal beating.  In any event, the trial court could properly infer that even if there had been some previous beating within the same week, Alexander would have been equally capable of manufacturing an explanation for her injuries on that occasion.

        We also reject defendant's claim that this application of the ordinary rules of evidence resulted in a deprivation of due process. As we noted above, defendant himself testified about a drug dealer confronting him about Alexander's outstanding debt, and defense counsel suggested the possibility that this may have been the motive for a beating that someone else inflicted in the hours between defendant leaving Alexander at their home and the stepson finding her at the uncle's home.  Therefore, the ruling did not completely preclude defendant from presenting a meaningful defense, and as a result the court's ruling did not violate due process.  (People v. Fudge (1994) 7 Cal.4th 1075, 1102-1103, 31 Cal. Rptr.2d 321, 875 P.2d 36.)

(Opinion at 4-5.)

        As an initial matter, to the extent petitioner is arguing that Alexander's hearsay statement was admissible under California Evidence Code § 1240, the state's spontaneous statement exception to the hearsay rule, he fails to raise a cognizable claim for federal habeas relief.  See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("[W]e have repeatedly held

that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'") (quoting McGuire, 502 U.S. at 67-68)). See also Rhoades v. Henry, 638 F.3d 1027, 1034 n. 5 (9th Cir. 2011) ("However, evidentiary rulings based on state law cannot form an independent basis for habeas relief."); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (same). "[F]ederal habeas corpus relief does not lie for errors of state law." McGuire, 502 U.S. at 67.

Next, as the state appellate court discussed, defense counsel argued that Alexander's statement should be admitted into evidence through Frazier's testimony as a spontaneous statement because it was made under the stress of excitement from being in pain from the beating. (2RT at 430-31.) Defense counsel was unable, however, to establish through Frazier's hearing testimony how long after the beating it was that Alexander made the hearsay statement at issue. (See 2RT at 417-21.) Thus, the trial court found that Alexander's statement did not qualify as a spontaneous statement since Alexander had, at a minimum, "several hours during that day to think about what kind of a story she was going to give." (2RT at 434.)

The exclusion of hearsay is a well-established rule "grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." Chambers v. Mississippi, 410 U.S. 284, 298 (1973). Because "[o]ut-of-court statements . . . lack the conventional indicia of reliability," they are "traditionally excluded" and exceptions are recognized for statements "made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination." Chambers, 410 U.S. at 298-99. If a particular hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, however, its exclusion may rise to the level of a due process violation. See Chambers, 410 U.S. at 300-03 (holding that the exclusion of a hearsay statement providing evidence of third-party culpability deprived the petitioner of a fair trial under the particular facts and circumstances of that case); see also Cudjo v. Ayers, 698 F.3d 752, 763-67 (9th Cir. 2012) (In light of the holding in Chambers, petitioner was entitled to federal habeas relief where the state

trial court erroneously excluded evidence from his trial which was unquestionably trustworthy, material and exculpatory); Lunbery v. Hornbeak, 605 F.3d 754, 761-62 (9th Cir. 2010) (same).

        As set forth above, in this case the state appellate court concluded that the exclusion of Alexander's statement to Frazier did not deprive petitioner of his right to present a defense and that his right to due process was not violated. This holding is not contrary to, or an unreasonable application of clearly established federal law. First, for the reasons expressed by the trial court in excluding the statement under the California Evidence Code, Alexander's purported statement to Frazier did not bear "persuasive assurances of trustworthiness." Cf. Chambers, 410 U.S. at 300-02 (improperly excluded hearsay statement had "considerable assurance of [ ] reliability" where it was made spontaneously, was corroborated by other evidence in the case, was self-incriminatory and "unquestionably against interest," and the declarant was available to be cross-examined); see also Cudjo, 698 F.3d at 762-63 (noting the California Supreme Court's finding that the excluded hearsay testimony - the outright confession of the alternative suspect pointed to by the defense as the perpetrator of the murder - was against his penal interest, made spontaneously within hours of the murder and consistent with at least some of the other evidence and thus given under circumstances providing substantial assurances that it was trustworthy and indeed "probably true" if made as claimed by the witness); Lunbery, 605 F.3d at 761-62 (improperly excluded hearsay statement was made against the declarant's penal interests, was made close in time to the murder in question, and was corroborated by at least three other pieces of evidence in the case). In contrast to the situations presented in Chambers Cudjo, and Lunbery, here, as both the trial court and state appellate court found, the statement at issue was not made spontaneously but rather was purportedly made by Alexander with the time, opportunity, or ability to reflect. (2RT at 434; Opinion at 4.)

        Of course, Alexander's purported statement to Frazier was also uncorroborated by other trial evidence aside from petitioner's own testimony. Perhaps most importantly, Alexander was not available to be cross-examined "so that her "demeanor and responses [could be] weighed

by the jury." Chambers, 410 U.S. at 301.  In this way, the facts of this case are similar to those presented in Christian v. Frank, 595 F.3d 1076 (9th Cir. 2010), where the Ninth Circuit reversed a district court's grant of habeas relief, holding that the state court had accurately distinguished the facts of Chambers from the case before it.  In so holding, the Ninth Circuit noted "the fact that the Supreme Court of the United States so heavily stressed that it was the 'trustworthiness' of the evidence at issue in Chambers that compelled its admissibility." Christian, 595 F.3d at 1085 (citing Chambers, 410 U.S. at 302).  In Christian, as in this case, the declarant's unavailability "contrasts sharply with the availability of [the declarant] in Chambers, which the Supreme Court of the United States stressed greatly enhanced the reliability of the extrajudicial statements . . . ." Id.

        Nor can it fairly be said that Alexander's purported statement to Frazier was "critical" to petitioner's presentation of a defense.  See Chambers, 410 U.S. at 302.  According to Frazier, her conversation with Alexander occurred "maybe three or four days" before Alexander's death.  (2RT at 415-16.)  Frazier was unable to say when the beating had actually occurred, though it "hadn't been long [prior]."  (2RT at 416.)  While medical testimony established that Alexander's largest bruise over her breastbone area was "a few days old," (1RT at 175), "all the others were more fresh appearing, and that would put them within a day or so of death."  (1RT at 176.)  Likewise, Alexander's rib fractures "had been there hours to a day or so."  (1RT at 177.)  A drug dealer attacking Alexander three to four or more days prior to her death would not account for the fresher and more serious injuries described in the medical testimony at petitioner's trial.  Thus, although the purported statement by Alexander which petitioner argues should have been admitted into evidence at trial was potentially beneficial to his defense, it would not have operated to exonerate him if believed.  Nor did it directly connect any particular person with the actual commission of the crimes with which he was charged.  At best, Frazier's additional testimony would have suggested a possible ground of suspicion pointing to the culpability of some unknown drug dealer.  Under such circumstances, the statement is

"sufficiently collateral and lacking in probity on the issue of identity that its exclusion did not violate the sixth and fourteenth amendments." Perry v. Rushen, 713 F.2d 1447, 1455 (1983) (holding that the excluded trial evidence in that case fell "far short of the critical and reliable evidence considered in Chambers . . . ."). See also People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (where the proffered evidence of third party culpability simply affords a possible ground of suspicion pointing to a third party and does not directly connect that person with the actual commission of the offense, the evidence may be excluded without violating due process) (citing Perry, 713 F.2d at 1449)).

     Moreover, although Frazier's testimony as to Alexander's hearsay statement was excluded from his trial, petitioner was still provided an opportunity to present the defense theory of the case that a drug dealer and not himself might have inflicted Alexander's fatal injuries. The jury heard testimony that Alexander was a drug user (1RT at 80, 90 [testimony of Sabrina Banks]), with her drug of choice being heroin (1RT at 111 [testimony of Manuel Silva]; 2RT at 447 [testimony of Dorothy Wade]). Wade, petitioner's mother, testified that she had observed Alexander going through withdrawal symptoms in the past on "several occasions." (2RT at 446-47.) Wade also testified that although petitioner had "gotten off" heroin, he and Alexander "were constantly not paying the rent and just most of their money was going to drug use . . . ." (2RT at 448.) Petitioner himself testified that he had observed Alexander withdrawing from heroin during the week before her death. (2RT at 560.) According to his trial testimony, on the morning of her death Alexander asked petitioner to get her a "fix." (2RT at 566.) He "declined," telling her that she "already owed a drug debt," and they argued. (2RT at 566, 609, 630.) Finally, according to petitioner's trial testimony, on January 26, 2006, petitioner was confronted by a drug dealer to whom Alexander owed money. (2RT at 568.) Based on this evidence, petitioner's counsel argued to the jury:

/////

     So how did it happen, when did it happen specifically after she left

18

> the house?  Like I said, I can't tell you I have proof that some particular bad guy, some drug dealer that she owed money to or something like that beat her, because I don't know.  It's not my job for – it's not your job either, to try to figure out how it did happen, so my job is to point out any reasonable doubts in the evidence that's presented, and your job is to ask and decide if there's any reasonable doubts in the theory presented to you.

(3RT at 781-82.)

Thus, the jury was presented with the defense theory that someone other than petitioner, perhaps a drug dealer to whom she owed a significant debt, inflicted Alexander's fatal injuries.  Petitioner was not deprived of a meaningful opportunity to present this theory of the defense case in violation of his right to due process.  Cf. Conde v. Henry, 198 F.3d 734, 741 (9th Cir. 1999) (trial court violated petitioner's right to due process where it improperly precluded defendant's attorney from making a closing argument explaining the defendant's theory of the case, refused to instruct the jury on the defendant's theory and, over the defendant's objection, gave erroneous instructions that did not require that the jury find every element of the offense).

For all of these reasons, the decision of the California Court of Appeal that the trial court's evidentiary ruling did not violate due process and did not preclude petitioner from presenting a meaningful defense is not contrary to, or an unreasonable application of clearly established federal law.  Therefore, petitioner has failed to establish that he is entitled to federal habeas relief with respect to the lone claim presented in his petition.

## CONCLUSION

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

In any objections petitioner elects to file, he may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: December 5, 2012.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:11
aubr0108.157